770 So.2d 663 (2000)
Ronald KNIGHT, Appellant,
v.
STATE of Florida, Appellee.
No. SC93473.
Supreme Court of Florida.
November 2, 2000.
*664 Curtis G. Levine, Boca Raton, Florida, for Appellant.
Robert A. Butterworth, Attorney General, and Scott A. Browne, Assistant Attorney General, Tampa, Florida, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty upon Ronald Knight. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons expressed below, we affirm the judgment and sentence.
Ronald Knight (Knight) was convicted after a nonjury trial of first-degree murder, armed robbery, burglary of a dwelling, and grand theft of an automobile. Knight was sentenced to death for the first-degree murder conviction, life imprisonment for the armed robbery conviction, fifteen years for the burglary of a dwelling conviction, and five years for the grand theft conviction. During the guilt phase of his trial, Knight represented himself, assisted by standby counsel, Mr. Sosa.[1]
The evidence presented during the guilt phase indicated that Knight and two accomplices, Timothy Peirson (Peirson) and Dain Brennault (Brennault),[2] agreed that they would go to a gay bar, lure a man away from the bar, and beat and rob him. The three found Richard Kunkel (Kunkel) and invited him to go to a party with them. Kunkel was driving his own car and followed Knight and the others to Miami Subs. After stopping to eat, the three convinced Kunkel to leave his car parked there and ride to the party with them. Knight then drove to a secluded area where they stopped twice and got out of the car to urinate.
Before they got back into the car after their second stop, Knight pointed a gun at Kunkel and told him to turn around and take off his jeans. As Kunkel was complying, Knight fired one shot striking Kunkel in the back. Kunkel fell to the ground and began crying for help. Knight then ordered Brennault and Peirson to search Kunkel's pockets. Peirson complied, but Brennault refused. Knight and Peirson then dragged Kunkel's body out of the road. They left Kunkel to die beside a canal where his body was later discovered. Knight threatened to kill Peirson and Brennault if they told anyone about the murder.
Later that night, the three men went back to Miami Subs where they had left Kunkel's car. Knight then stole Kunkel's car and took it for a joy ride to see how fast it would go. Some time later that evening, the three men broke into Kunkel's house and stole various items.[3]
When Peirson and Brennault were first questioned about the incident by the police, they denied any knowledge of the murder; however, both men later confessed. Knight bragged about the murder to Christopher Holt. Peirson, Brennault, and *665 Holt all testified against Knight during the guilt phase of the trial.
During the penalty phase, the State presented evidence that Knight had previously been convicted of another murder occurring under very similar circumstances. The other aggravating factors presented and relied upon by the trial judge were that the murder occurred while Knight was engaged in the commission of a robbery, the murder was committed for pecuniary gain, and the murder was cold, calculated, and premeditated. The trial court merged the "committed during a robbery" and "for pecuniary gain" aggravators. Knight presented some mitigation, the most significant of which was expert witnesses who testified that Knight suffered from a paranoid disorder that was exacerbated by his unstable childhood. The court gave this mitigating factor considerable weight. Knight also presented mitigating evidence that he had the support and love of his mother, brother, and sisters and that the death penalty would be disparate treatment because his cofelons received much lighter sentences. The court gave these factors little weight.
Knight raises three arguments in this appeal: (1) the court erred in allowing Knight to represent himself; (2) the court erred in failing to renew its offer of court-appointed counsel at every critical stage of the proceeding; and (3) the court erred in considering Knight's prior murder conviction as an aggravating factor in sentencing him to death because the other murder occurred after Kunkel's murder. We find all of these arguments to be without merit and therefore affirm the convictions and sentences.
First, Knight argues the court erred in allowing him to represent himself. We disagree. There is a delicate balance between a defendant's right to counsel and the right to self-representation. In Nelson v. State, 274 So.2d 256 (Fla. 4th DCA 1973), the court held:
[W]here a defendant, before the commencement of trial, makes it appear to the trial judge that he desires to discharge his court appointed counsel, the trial judge, in order to protect the indigent's right to effective counsel, should make an inquiry of the defendant as to the reason for the request to discharge. If incompetency of counsel is assigned by the defendant as the reason, or a reason, the trial judge should make a sufficient inquiry of the defendant and his appointed counsel to determine whether or not there is reasonable cause to believe that the court appointed counsel is not rendering effective assistance to the defendant. If reasonable cause for such belief appears, the court should make a finding to that effect on the record and appoint a substitute attorney who should be allowed adequate time to prepare the defense. If no reasonable basis appears for a finding of ineffective representation, the trial court should so state on the record and advise the defendant that if he discharges his original counsel the State may not thereafter be required to appoint a substitute. See Wilder v. State, Fla.App.1963, 156 So.2d 395, 397. If the defendant continues to demand a dismissal of his court appointed counsel, the trial judge may in his discretion discharge counsel and require the defendant to proceed to trial without representation by court appointed counsel.
Id. at 258-59. Thus, pursuant to Nelson a defendant may be forced to represent himself if he chooses to dismiss court-appointed counsel without good cause.
This conclusion is supported by the Supreme Court's holding in Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). In Faretta, the Court held a defendant may waive the right to court-appointed counsel and choose to represent himself as long as the waiver is knowing and intelligent:
When an accused manages his own defense, he relinquishes, as a purely factual matter, many of the traditional benefits *666 associated with the right to counsel. For this reason, in order to represent himself, the accused must "knowingly and intelligently" forgo those relinquished benefits. Johnson v. Zerbst, 304 U.S., at 464-465[, 58 S.Ct. 1019]. Cf. Von Moltke v. Gillies, 332 U.S. 708, 723-724, 68 S.Ct. 316, 92 L.Ed. 309 [(1948)] (plurality opinion of Black, J.). Although a defendant need not himself have the skill and experience of a lawyer in order to competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that "he knows what he is doing and his choice is made with eyes open." Adams v. United States ex rel. McCann, 317 U.S. [269] at 279[, 63 S.Ct. 236, 87 L.Ed. 268 (1942)].
Faretta, 422 U.S. at 835, 95 S.Ct. 2525. The combined effect of Nelson and Faretta is to allow a defendant to represent himself after he has waived his right to court-appointed counsel by knowingly and intelligently dismissing court-appointed counsel.
In this case, the trial court held a proper Nelson/Faretta inquiry on October 31, 1997, in response to Knight's request to dismiss his court-appointed counsel, Ms. Perry.[4] At that time, Ms. Perry was his first-chair counsel and Mr. Sosa was his second-chair counsel.[5] Knight was given an opportunity to explain any problems he had with Ms. Perry. He told the court that he was dissatisfied with her services and would like her taken off his case and another lawyer appointed. In the alternative, he requested the opportunity to hire a private attorney to represent him. When pressed by the trial court for a reason, Knight stated:
THE DEFENDANT: There are a few reasons. I have spoken to her already; she doesn't feel that there is any kind of problem or she doesn't see a problem. I, myself, see a problem whereas the way my case is being handled, the way it's being prepared as to the things that I should know or don't know, you know, prior to me being at the county jail.
So far, I mean, I don't know anything since the day one, you know, on a case that I was already up for, you know, four years prior, and I am just not up toI have been through this once already. I don't want to be dragged through it again. I don't feel she's represented me to the best of her ability, in my opinion.
In response, the trial court indicated that this appeared to be a communication problem, rather than an ineffective representation problem, which would not require a full Nelson inquiry. See Lowe v. State, 650 So.2d 969 (Fla.1994) (holding a defendant's general grievances did not warrant additional inquiry where the defendant could point to no specific acts of counsel's alleged incompetence); Smith v. State, 641 So.2d 1319 (Fla.1994); Augsberger v. State, 655 So.2d 1202 (Fla. 2d DCA 1995) (finding appellant's stated basis for dissatisfaction was obviously founded on what he perceived to be inadequate conferences with his attorney which, without a more specific claim of incompetence, does not require a full Nelson inquiry). However, in an abundance of caution, the trial court conducted a full Nelson inquiry.
The trial court asked Ms. Perry to detail some of the work she had performed on Knight's behalf, to which she responded:
MS. PERRY: I requested a demand for discovery; I have made at least four supplemental demands for discovery requesting approximately 50 to 75 items. I conducted depositions in this case at *667 least four times and have been unsuccessful in deposing probably 20 to 25 witnesses out of a hundred.
I drafted several motions, I retained experts on Mr. Knight's behalf to investigate this case. I am doing what I usually do in these types of cases. I have seen Mr. Knight probably on an average of once every three weeks, sometimes once every two, it depends.
In addition, Ms. Perry stated that she always did the best she can for her clients and that she was performing the work necessary to prepare a case of this magnitude. Ms. Perry denied having any particular problem representing Mr. Knight.
At the conclusion of the Nelson inquiry, the court found Ms. Perry had not been incompetent in representing Knight and gave Knight the following options:
THE COURT: Mr. Knight, these are your choices. If you want to discharge Ms. Perry, I will honor that request. I have no reason to believe that she's not doing a thorough job in preparing your case; I have no reason to think that she's ineffective in any way whatsoever. You don't like her, you don't want her, just say so, I will not replace her. At that point you will decide to proceed on your own. If you feel you want to do that, you can decide to proceed with Mr. Sosa, who is second chair appointed at this point.
If you want to hire own counsel be my guest. Today, I just need to know that you understand your choices and have you make an intelligent one.
THE DEFENDANT: So I am to understand that you will go along with me in saying that she will be taken off my case?
The court advised Knight that Ms. Perry would be removed from his case; however, the court stressed that he "was not going to get another one at public expense." In response, Knight stated: "Yes, sir, that's fine."
After a discussion with Mr. Sosa, the court also made it abundantly clear that Mr. Sosa would not be moved into the first-chair position by virtue of Knight dismissing Ms. Perry:
MR. SOSA: Your Honor, I was mentioning to my client that I believe the Court indicated a few minutes ago that if Mr. Knight was adamant in dismissing Ms. Perry, that thisthe Court would not appoint another attorney. That puts me in a position of being first.... So I'm telling Mr. Knight that I don't think I can serve as first and second chair at the same time in this case.
THE COURT: I think that's fair that you explained all that.
Let me back up to where we were at the beginning. The decision to do this is entirely yours, and if you don't feel comfortable making it today, don't do it. You brought this to my attention saying you no longer wanted Ms. Perry. Perhaps my advice to you is to keep Ms. Perry and Mr. Sosa, let them work together to help you on your case. Again, my whole point of this hearing is to make sure you understand your choices so that you can decide what you want to do on your case.
THE DEFENDANT: I know I do not want Ms. Perry representing me on my case any longer....
. . . .
THE COURT: And if I discharge Ms. Perry, what are your intentions?
THE DEFENDANT: I will try to obtain other counsel.
THE COURT: And if you are unable to or your family is unable to obtain additional counsel to assist Mr. Sosa, what are your intentions?
THE DEFENDANT: That I wouldn't, you know, I am not going to I understand that to the point where like if I am not able to obtain any counsel as first chair, because he's made it clear he can't do it, I can'tI'm not asking him to do both. I do not want *668 Ms. Perry. I am not quite sure that I will be able to obtain counsel to do first chair to help Mr. Sosa out.
THE COURT: Let's contemplate a worse case scenario. I discharge Ms. Perry, she's gone; you are unable to obtain counsel on your own counsel or through the help of your family; Mr. Sosa would be hard-pressed to represent you on both; then what?
THE DEFENDANT: I would not have that burden put on him. I'd just, today, like to have her taken off my case. I will get counsel to help.
THE COURT: Are you not listening to my question? Suppose you are unable to obtain new counsel to assist Mr. Sosa. What do you think you are going to do then?
THE DEFENDANT: At this point I don't know, Your Honor.
THE COURT: Well, you need to think about that because you will be left with either being co-counsel on your own with Mr. Sosa, representing yourself without Mr. Sosa, or placing a heavy burden on Mr. Sosa, which he at this point indicates he's not willing to accept.
Do you understand that I am not going to replace Ms. Perry at public expense.
THE DEFENDANT: Yes, I understand that.
THE COURT: Are you going to be prepared to represent yourself or assist Mr. Sosa in representing you?
THE DEFENDANT: If need be, yes, sir.
THE COURT: Do you understand what that means?
THE DEFENDANT: Yes, sir.
The court went on to question Knight about his educational background and to warn him of the dangers of representing himself. Prior to dismissing Ms. Perry, the court again asked Knight if he understood what his options would be after she was dismissed from the case. Knight assured the Court he understood his options:
THE COURT: I just want you to understand ultimate [sic], Mr. Knight, that this is your case. My concern is whenever we have a trial that you make intelligent choices and you conduct a fair trial.
THE DEFENDANT: That's the point, I understand it's my case, that's why I want the Court to understand why I want Ms. Perry removed from my case.
THE COURT: All right. I am about to grant your request to discharge Ms. Perry from representing you. Just for the last time, do you understand that that will leave you either representing yourself alone, or together with Mr. Sosa, or obtaining your own counsel if you are able to do that?
THE DEFENDANT: Yes, sir.
THE COURT: Very well. I find that Mr. Knight certainly is an intelligent person; he understands what he is doing here today, and by his choice Ms. Perry is discharged and relieved from duty in this case. Ms. Perry will not be replaced as first chair at this point. Mr. Sosa remains as the sole court-appointed counsel at Mr. Knight's request.
Thus, the record clearly indicates the court did not err in allowing Knight to represent himself.
The court informed Knight that another first-chair counsel would not be appointed at public expense. The court also conducted a proper Farreta hearing to make sure that Knight's waiver of court-appointed counsel was knowing and intelligent. At no time was Knight misled that Mr. Sosa would replace Ms. Perry as first-chair counsel. To the contrary, Knight explicitly stated that he understood Mr. Sosa could not undertake that burden due to his other cases, and that he was willing to represent himself if he was unable to obtain private counsel.
Knight argues the court erred in failing to conduct a proper Nelson hearing *669 at the January 8, 1998, hearing where he asked that Mr. Sosa also be dismissed from his case. The court did not err in failing to conduct a full Nelson inquiry prior to dismissing Mr. Sosa because Knight's only complaints about Mr. Sosa were that he agreed to postpone the trial and that he did not have enough contact with Knight. Neither of these complaints related to Mr. Sosa's competence. See Lowe, 650 So.2d at 969; Smith, 641 So.2d at 1319; Augsberger, 655 So.2d at 1204. Therefore, the court was not obligated to conduct a full Nelson inquiry.
Knight's second claim is that the court erred in failing to renew the offer of assistance at every critical stage in the proceeding. Although Florida Rule of Criminal Procedure 3.111(d)(5) requires the court to advise a pro se defendant of the right to counsel at each subsequent stage of a trial, we indicated in Traylor v. State, 596 So.2d 957 (Fla.1992), that in situations where a defendant has properly waived the right to counsel, a trial court may proceed with the stage where counsel was waived without further offer of counsel. We deny relief on this claim because the trial court was not required to offer counsel during the same stage of the proceeding where Knight waived his right to counsel, the trial portion.
At the January 8, 1998, pretrial hearing, Knight requested the court dismiss Mr. Sosa, penalty phase counsel. The court conducted a Faretta hearing and found Knight competent to waive his right to counsel. As it had done when it dismissed Ms. Perry, the court informed Knight that no other counsel would be appointed to replace Mr. Sosa if he chose to proceed with dismissing him. Knight stated that he understood this and wanted to represent himself. The discussion between the court and Knight at the January 8 hearing focused on Knight's representation at his upcoming trial. The court determined Knight knowingly and voluntarily waived his right to be represented by counsel at his trial and had done so at the October hearing.
At the commencement of trial on March 11, 1998, the court asked Knight if he still wished to proceed without counsel. Knight responded affirmatively by stating he had read the January 8 hearing transcript and that he would answer all the questions the same. At the January 8 hearing, the court warned Knight of a barrage of dangers associated with not having counsel. The court questioned Knight as to whether he understood a trained lawyer would be more familiar with the law and court procedures and whether he understood that it would be smarter to proceed with counsel. Knight continually agreed that a lawyer would have more knowledge and skills to represent him, but insisted that he wanted to represent himself. The court also explained that Knight would not receive any special consideration for representing himself by the court, the prosecutors, or the jail library. Knight stated he understood these things, but still chose to represent himself. In concluding the inquiry, the court stated:
THE COURT: Well, Mr. Knight, having advised of your right to counsel, the advantages of having counsel, disadvantages and dangers of proceeding without counsel, the nature of the charges and its possible consequences of that outcome here, are you certain that you do not want to have a lawyer to represent you here?
THE DEFENDANT: Yes, sir.
Thus, the court renewed its offer of court-appointed counsel at the beginning of the trial by asking Knight if any of these answers would be different. See State v. Roberts, 677 So.2d 264 (Fla.1996).
Moreover, the court was not required to renew the offer of court-appointed counsel at the beginning of the trial for two reasons. First, the October 31 waiver was in regard to Knight's trial phase representation. As such, the beginning of the trial was not a subsequent stage of the *670 proceeding.[6]See Lamb v. State, 535 So.2d 698 (Fla. 1st DCA 1988) (stating the pretrial hearing on the waiver of counsel addressed Lamb's competence and ability to appear pro se at the trial stage, and the fact that the trial occurred three weeks later is immaterial). Second, Knight had Mr. Sosa present as standby counsel during the entire guilt phase of the trial. Knight willingly accepted Mr. Sosa as standby counsel and consistently relied upon him. Standby counsel is a constant reminder to a self-representing defendant of his right to court-appointed counsel at any stage of the proceeding. See Harrell v. State, 486 So.2d 7 (Fla. 3d DCA 1986); see also McCarthy v. State, 731 So.2d 778, 781 (Fla. 4th DCA 1999); Mincey v. State, 684 So.2d 236, 238 (Fla. 1st DCA 1996). Accordingly, Knight's claim that the court erred by not renewing the offer of court-appointed counsel is without merit.
In his third claim, Knight argues the court erred in using his prior violent felony conviction as an aggravating factor because that murder occurred after the murder in this case. This claim is without merit. In Elledge v. State, 346 So.2d 998, 1001 (Fla.1977), the Court determined it was proper to consider a subsequent crime as a prior violent felony. There, the Court stated: "It is clear that the Legislature referred to `previous convictions' and not `previous crimes.'" See also Knight v. State, 746 So.2d 423 (Fla.1998); Daugherty v. State, 419 So.2d 1067, 1069 (Fla.1982); King v. State, 390 So.2d 315, 320 (Fla. 1980); Lucas v. State, 376 So.2d 1149 (Fla. 1979). Thus, because the conviction for the other violent felony occurred prior to this penalty phase, the trial court properly considered it as an aggravating factor.
We also find the trial court gave adequate weight to the aggravating and mitigating factors in this case, and that the death sentence was proportionate to other cases with similar aggravating and mitigating factors. See generally Ferrell v. State, 680 So.2d 390 (Fla.1996) (death sentence for first-degree murder affirmed where Ferrell shot his girlfriend in the head and the only aggravator was a prior violent felony conviction); Gamble v. State, 659 So.2d 242 (Fla.1995) (Gamble, a twenty-year-old offender with childhood abuse, neglect, and severe emotional problems, killed his landlord during a robbery); Duncan v. State, 619 So.2d 279 (Fla.1993) (single factor of prior violent felony convictions supported death sentence despite existence of numerous nonstatutory mitigating factors); Hayes v. State, 581 So.2d 121 (Fla.1991) (Hayes was an eighteen-year-old who volunteered to shoot a cab driver he and his codefendant intended to rob). Having found no reversible error, we affirm Knight's convictions and sentences.
It is so ordered.
WELLS, C.J., and SHAW, HARDING, PARIENTE, LEWIS and QUINCE, JJ., concur.
ANSTEAD, J., concurs in result only.
NOTES
[1] During the penalty phase of the trial, Knight was represented by Mr. Sosa.
[2] Peirson received three years in prison and Brennault received five years' probation. The evidence revealed neither of them knew Knight planned to kill Richard Kunkel.
[3] Knight took Kunkel's keys and wallet from him after he shot him. He got Kunkel's address from his driver's license.
[4] Knight's counsel also conceded this point during oral arguments before this Court.
[5] There has been some confusion about the terms first- and second-chair counsel. However, in this case first-chair counsel refers to counsel responsible for the guilt phase of the trial, and second-chair counsel refers to counsel responsible for the penalty phase of the trial.
[6] A defendant's right to have court-appointed counsel discharged and right to represent himself becomes meaningless and a source of gamesmanship if the trial court has to offer counsel to the defendant each time he appears in court.